The final case for oral argument this morning is 21-8047 Merit Energy v. Haaland. Mr. Shepard for the appellants. Yes, thank you, Your Honor. My name is John Shepard. I represent the Merit Companies as appellants in this case. This appeal involves the Secretary of the Interiors use of a formula to calculate what is called the major portion royalty value under leases that Merit has on the Wind River Reservation in Wyoming. And the major portion value applies to the value of asphaltic sour crude oil that is produced by Merit from its leases. And the problem here is that there are express terms in the leases that define how the major portion value is calculated, and the formula used by the Secretary does not follow those with those express terms. Counsel, it's a threshold matter. Is the government correct that you're pending administrative appeal on past royalty payments raises the same issues that you're raising here? Partially correct, and I say partially correct because there is a legal issue pending in that administrative appeal over the validity of the formula itself. However, that administrative appeal only covers the past time period. What happened was the regulations were adopted in 2015, but there was no index-based major portion price published for asphaltic crude oil until May of 2019. When those prices were published, they were retroactive to 2017. And what that administrative appeal covers is during that time Merit paid royalty based on its sales prices under the regulations. And the appeal raises the question of whether the government can come back retroactively, publish these prices that require royalty at a higher price. But aren't you challenging the formula in that proceeding as well, the IBMP formula? We are, yes. And if that's the case, wouldn't the outcome of this appeal affect that administrative appeal? It would affect that administrative appeal. It would. But, and this gets I think into the rightness issue, whether you should wait for the administrative appeal to be decided. Because the appeal could decide the validity of the formula in the administrative form. It could, that's possible. That appeal has been pending for two and a half years and nothing has happened on that. And I think the point in terms of rightness is that this appeal is still, this case is still ripe because Merit is forced to comply now since that administrative appeal was filed. Now with the higher IBMP index based major portion price currently and for production since 2020 and has had to pay over a million and a half dollars to comply with that price. That issue was not raised in the administrative appeal going forward. Do we have to pay based on the IBMP? If I understand the government's argument, they're not, we can ask them too, but they're not arguing that this case is ripe on Article 3 grounds, but it's more of a prudential argument that maybe this isn't the right time to be deciding this given everything else that's going on. I think that's a fair assessment of their position. It is a prudential kind of argument, but the reason that this case should be deemed ripe and is prudential to proceed to decide it is that Merit has to comply. While this administrative appeal is pending, Merit has to pay on the higher price and there's no ability for Merit to seek a stay of that requirement. And this court in the Farrell Cooper case held that you don't have to pursue an administrative appeal that's pending unless you have the ability to get a stay of that decision. And in that case, there was no stay and the court held despite the pending administrative appeal, the case could proceed in court. If you are successful in attacking the formula in the administrative proceeding, wouldn't that necessarily require a recalculation of all the payments you're making ongoing under an improper formula? So wouldn't at the end of the day, even though it's been years and it's uncertain, but when they make a decision and if you prevail, doesn't everything get adjusted from today going back to whenever the formula was? I think that's one possible outcome of the administrative appeal, but again, the specific appeal only involves this past time period before May of 2019. If I'm correct on that statement, why isn't that a pretty good argument for the federal court staying its hand? I think if there was some ability to obtain a stay of that requirement to pay based on the index-based major portion price that we're challenging, the answer would be yes. I think it would be appropriate to wait for the outcome of that appeal. We can't obtain a stay. We can't even get the government to issue us an order on this, and so there's nothing for us to obtain a stay on. So we're forced during this meantime, which now has been two and a half years with no end in sight, having to comply with a regulation subject to huge daily penalties if we don't comply. When you say you can't get a stay, are you saying that there isn't a legal basis for one? No, there's no procedure for one in the Department of the Interior for this because the pending appeal only deals with the past time period. It's in order to pay an additional amount of $3.5 million for the past. It doesn't cover the requirement to pay based on this IBMP price going forward. That is in the regulations. There's no option given either to the Interior. The regulations require us to pay based on that higher price, and that's why this case is ripe and should be decided despite the fact there's a pending administrative appeal that could raise pretty much the same issue. Let me address a couple of what I think are the government's main arguments on the rightness because it's jurisdictional, and I can see already that's one of the issues in your mind. The government argues that this is just an abstract and hypothetical situation for merit, and nothing has been applied, but this is directly contrary to everything in the appellate record. Since 2019, as I said, merit has had to pay on the higher of these two prices, the formula price or the sales price, and the Secretary admits that in her brief. There's no question about that that we've been forced to comply, and since the fall of 2019, there have been many months when that formula IBMP price has been higher than merit sales price. There's declarations in the record on the additional royalty that merit has had to pay to comply with that IBMP price. Also in the record is the fact that merit tried to pay royalty based on its sales price instead of the higher IBMP price. The Department of the Interior rejected those royalty payments and said you can't do that. You have to pay on the higher of the two, and it's clear again that there are serious daily penalties, $27,000 per day. If merit were to not pay on the IBMP price, the only option at that point would be to not pay royalty at all, which is not a very good option because it subjects you to those serious penalties. So all of the rightness cases that talk about situations like that, like this, where you're forced to comply in the meantime on paying of huge daily penalties, those cases find that is a right case for the court to review. The government's second argument is that there's nothing concrete here to be reviewed until they come out and do an audit and issue an order to us for this time period starting with royalties paid in January 2020 going forward. And I think this argument really highlights the unfairness of the government's position because the decision to do an audit and issue an order is entirely up to the Secretary of the Interior. Merit has no ability to force this audit or order to be issued, and there's no reason for the government even to do it because we have to pay on the higher IBMP price during the meantime anyway. There's no reason for the government to do an audit or issue an order. So the ability to get something, an order, that we could then appeal on the current IBMP prices is something entirely in the power of the Secretary of the Interior. And again, in the Farrell Cooper case, the court commented that you can't subject judicial review to the discretion of the agency. But turning to the formula, is it your principal contention that the formula that's used is untethered to the least? You're not quarreling with the idea that some formula, they need to come up with a formula, and they have some range of discretion to do so. But here they're outside the range of arbitrariness. That's exactly right. I think you've summarized our position well there, and there's two main problems with this formula, not any formula whatsoever. The two main problems are that they're starting with a price for sweet crude in Cushing, Oklahoma, which is entirely different from asphaltic crude oil, which is the oil that Merritt produces. And then they're trying to adjust that sweet crude price for asphaltic crude values on the reservation, but using prices two or three months before the time of production. Where did the district court go wrong, Ben, in your judgment? Where the district court went wrong, I think the court tried to find some discretion in the secretary to adopt a formula in a way that would come up with a published IBMP price before royalties were due. And the district court concluded that to do that, the department would have to use prices that were two or three months old. The department found that the 10% cap simply couldn't be justified on any basis whatsoever, because that would prevent the major portion price from really being what it is. But where I think the district court went wrong was in not reading the language time of production given as plain reading. Time of production means the month that the oil is produced and sold. That's when you have sales prices in effect. That's when you can look at what the values are based on that data. Well, the secretary had some discretion. If she was contrary to the lease provisions, the lease controls. Exactly right. And that's our position. The lease controls. And the lease does not permit this index-based uh IBPM or MP. IBMP, yes. I got it written down here because I can never remember it. To use the sweet crude and then reduce it by some percentage. That's exactly right. And the problem is that you end up with a major portion price that can be double the prices that Merritt and other producers on the reservation can sell the asphaltic crude oil for. It has to do with the difference between asphaltic crude oil and sweet crude. It's about 37 percent, isn't it, roughly? I'm sorry? Is it 37 percent differential between the sweet and the asphaltic? It varies from month to month. And that's part of the problem here, that you can have months where a calculated IBMP might work for asphaltic crude oil for that particular month, but the market for asphaltic crude oil moves in different directions from the market for sweet crude, and they use different index prices. And when those markets diverge, that's where this formula simply does not work. And it leads to a price that is way higher than what the major portion price should be. What the major portion provision is for is to make sure that a company pays royalty at the upper end of true market prices for the major portion of the oil produced, not to lead to a price that is way higher than anybody can possibly sell the oil for in that month. Well, if it's just looking back a couple of months, wouldn't that time lag even out over a period of months or years, even that just because we're looking backwards a couple months shouldn't matter that much? It matters a lot, actually, in this case, and the district court noted this. It's common knowledge that the price of oil can dramatically change from month to month. And so even a two-month difference can yield a very different calculation of that differential between sweet crude prices and asphaltic crude prices. So two months can make a huge difference in this case. And if we look at the declaration of Mr. Sudar that's in the record, he's with the Office of Natural Resources and Revenue, and he details month by month the differential in published index prices between the NYMEX price of sweet crude and Cushing versus Western Canada Select. And there are months where they kind of move in the same direction, but there are months where the variation becomes gigantic, and that is the problem. Could I just ask you to articulate? I'll permit some more time. Okay. So tell me why the 10% is a problem. Could you just explain that to us from your perspective? Yes, hopefully I can do that well. The 10% is a problem because when the government calculates what they call the location and crude type differential, and that's what the 10% applies to, they'll look at the prices for asphalt or crude oil two months before. Again, it's the wrong time period, but those are the prices they use. And let's say that those prices should lead to an adjustment in the calculation of the IBMP price that would be 20% or 30% difference. The 10% cap limits the amount that that differential can move. And when the government, the government admits that the major portion price from being the true major portion in that price in that month down the road, hopefully, you know, by making that 10% adjustment six months in a row, you'll get there. But for those six months, Merit has to pay royalty on the higher price. And there's no compensating, going back to one of your questions, going back to just no compensating benefit for Merit because it has to pay on the higher of that IBMP price or its sales price. So when the market price is increasing, Merit has to pay on the higher price and that's fine. Okay, just a quick follow up. So what language in the lease prohibits this 10% cap? The language that prohibits it is the use of the highest prices paid or offered for asphalt and crude oil. It's the same quality oil we produce at the time of production. And the 10% cap will prevent those prices from being prices at the time of production. There'll be an artificially limited price because of the 10% cap. It will not go to the true price at the time of production. Same language in the lease that you're relying upon to make your three month argument. Exactly right. That is really the same analysis on the Merits for both the use of prices two or three months old and the 10% cap. Both are contrary to the time of production language in the lease. And is it possible to calculate as the lease requires the price for the major portion of the oil of the same price? That would not be a public price itself. And what the department did for decades was they would do their audit, they would collect the prices, and then calculate the major portion price based on the actual prices paid and reported. And that's how it works today for any gas produced from Indian leases. It's done retroactively. There's no, frankly, there's no requirement to academy calculate it though per the terms of the lease. Yes, it absolutely can be calculated per the terms of the lease. And that's our, that's the remedy that we ask for in this case, to reverse the use of this formula and send it back to Interior to calculate the major portion price based on the language of the leases. Okay, thank you counsel. Let's hear from the government. May it please the court, my name is Michael Gray. I'm here on behalf of the Department of the Interior. The case simply isn't right. They've brought a challenge that they say is an as-applied challenge when there's no application, that they're directly challenging. It's not a facial challenge to the regulation itself, so it has to turn on application. And as counsel conceded, the same legal issues are before the agency right now. And so what you have is a risk of disrupting the orderly resolution of that agency process. And in fact, I've already seen disruption of the orderly resolution of that process. He complains about the time, but we have this litigation ongoing. We have a district court order that changes the rules for the agency to apply, to have an appeal. And so it's natural that the agency is waiting to see what happens before it resolves the case, because it doesn't know for sure what rules it's operating under. So just the very existence of the litigation has resulted in the delay that he complains about. He says the case is right because of compliance costs, that they have to comply in the interim. All that is, is compliance with what he must concede is a facially valid regulation. He says there are months in which this could result in a major portion price that would be correct, even under his view. Well, doesn't the regulation specifically say to the extent of lease and the regulations are inconsistent, the express lease terms control? It does say that. It does say that. And doesn't this regulation does not conform to the lease language? Well, we would disagree with that on the merits of it, that it does actually- Well, you can disagree all you want, but the lease says one thing and the secretary says another thing, and they're not the same. Well, I don't think that that's an accurate statement of our view here or of the law on this, that what the lease says and the terms are not defined is, as the district court pointed out, you calculate on the basis of the highest price paid or offered for the major portion of the oil in the area. In the area where it was- Where it was produced. In Oklahoma, close to where this oil, this sulfur- It's not, and that's why we have the differential. And so what the agency did, and it's doing this across thousands of leases and not seeing the issues that Merit's complaining about here, but what the agency did is it said, we're going to take the New York Mercantile Exchange price for Light Sweet Crude Cushing, and we're going to subtract from it, we're going to use actual sales data for a year that averages the difference between those. So sales data from the area for the crude type. So Wind River Reservation data for Asphaltic Crude, they averaged the difference in sales prices and said, this is going to be our differential. And the record shows in the agency meetings that they expected that differentials would be fairly stable over time. These things tend to move in concert. What is the differential, roughly, between Sweet Crude and Asphaltic Crude? It's about 37%, isn't it? I think Council is correct that it varies over time. I'm not sure what the current differential is set at. I think the initial one may have- I don't want to- I'm not sure exactly what the differential is. That's close enough. It doesn't particularly matter, I don't think, for the issues. Assuming it's 37%, what is 10% off the Sweet Crude price due to the- So the way this- and this is, you know, this is very complicated. So I'll try to back up and maybe explain how the adjustment to the differential works. And the basic idea is, once you've set that differential, and we know that- let's take this 37% less. Typically, if the price goes up in Oklahoma, then the price moves up with it for Asphaltic Crude. And you would still have that 37% difference, no matter what the price is. The problem comes when there's a divergence. One goes one way, one goes the other way, and now maybe the differential, instead of 37% for that much, shows it was 45%. And the way this works is, they monitor it. The major portion of oil is defined to be the number of barrels sold, 72% to 78%, that use that major portion price. So if somebody's getting more than that, they report it as gross proceeds. That needs to be between the differentials working. So they look at the barrels reported, the prices for them, and they say if 25% of producers are reporting at their gross proceeds, that means 75% are reporting a major portion. That's what we're looking for. When that goes- gets skewed, and now say 20% are reporting at gross proceeds, now the differential needs to be adjusted. And so what the 10% does, is it comes in and adjusts only the differential. So if it's 37%, that would be a 3.7% adjustment in the differential. It doesn't have anything to do- they're still using the Dimex price, they're still using reported prices to do it. They're just trying to keep that differential in the right range, so that the reporters are giving 75% on the major portion price, and 25% on the gross proceeds. But the royalty will be paid on the higher price. On the higher price. And it'll be significantly higher if it's only adjustment by 3.7%. It could be. Like 6.5 million. Well, I don't know that we would agree with their numbers on that, but this shows why the agency should get the chance to look at it. It could be that the agency will look at that divergence in those circumstances where you had a glut of asphaltic crude from Canada, so you had a big price drop. The agency may look at that in the administrative process and say, this was an extraordinary circumstance. We think relief is warranted under these facts. And so the agency ought to get the first crack at that. It doesn't mean that the differential is wrong, or the adjustment to the differential is wrong, or the use of the index is wrong, that there may be divergences in particular months. Most of the time, the record showed, we did an analysis, 95% of the time, the Western Canadian Select Index moves in concert with NIMEX over a 15-year period. So that's what you would expect. That's why this was a negotiated rule. That was negotiated by Interior, the industry, the tribes, and this is what they came up with to provide certainty in implementing this lease provision. And going back to your question, Judge Kelly, about is this inconsistent with lease provision, the entire purpose of the negotiating rulemaking committee was to implement this lease provision. This is not a provision that's unique to merits leases. It's representative of the majority of Indian oil leases. And so they formed a committee that said, how are we going to implement this language to provide consistency and certainty to the industry, to provide the correct fair market returns to the tribes? And this was the method that they came up with. Why couldn't they just follow the lease and come up with the highest price offered at the time of production of the same quality and gravity from the area where the lease premises are situated? What's the problem with that? That's the lease. It says that. I'll give two responses to that. First, we would say that the index price does implement that language and comply with it fully. But the problem, what you're describing is the way they used to do it. And the problem with the way they used to do it and why they formed the committee to try to revise how they were doing it is it until one or two years later, what their obligations were for the particular month. Because Interior had to gather all of the data, average it out, make sure everything was right, make sure there weren't any adjustments that industry was making to their reporting. And then only later come back and say, okay, now you reported at this price, but it's two years later and it should have been this price and you have to do it. Well, the industry didn't like it. It wasn't good for the tribes. And so they said, let's come up with an index-based formula that implements this in a way that will provide some certainty and clarity on a month-by-month basis. So now they know each month what they have to pay. And there's not this idea that they might have to pay and then come back and readjust. And so that was the problem with doing it that way with this negotiated rule. That's why they say a camel was put together by a committee. It may be, but you know, the language of the lease says major, it's a major portion. And so this whole thing is designed to get at the 75 percent point of barrels reported. Counsel, you started to move back, I think, to some of the ripeness considerations. Isn't one factor in looking at prudential ripeness the hardship to merit in this circumstance? And they're arguing, if I understand it, that if we say that this case is not prudentially ripe, they could only obtain judicial review through non-payment of royalties. Could you, and there may be more to this as well, but could you address the hardship question? Sure. And I think the hardship has to be taken into account in this case because there is a pending administrative appeal with the same issues that could resolve all of their claims going forward as well. And so what they're saying is that we have a hardship in that we have to comply with what is a facially valid rule. I mean, typically the hardships that they're articulating, we have to comply with a rule, are grounds for challenging the rule facially and say, this can never be applied to us. But they're not doing that. And it's clear that it can be applied in some months. And so there's no hardship with having to comply with a facially valid rule and then wait and seek review later if, in fact, it's applied in a way that you think violates the lease for those months. And they have the ability, should they win in the administrative appeal, of course, and it resolves their claims, to go recoup any payments that they've made. Also, they no longer even hold one of these leases, so it's difficult to show hardship based on that. The other one expires at the end of next month, and there's no guarantee that they will continue to hold that lease. So there's hard to come up with ongoing hardship. That actually reminds me of, you haven't argued that there's a mootness issue with the expiration of these leases. I think it would, we haven't yet, particularly because it wasn't clear at the time that both would, we don't know that both will have expired. I think when the other lease expires, if it's not renewed and they're no longer the leaseholder, then certainly any claim for prospective relief would be moot at that point, because they will no longer have the leases. Well, isn't that what they're claiming here, is for prospective relief? Yeah, exactly. Is there a potential mootness issue in this case? I think there is. I think there is, based on what they brought. Assuming that that lease is not renewed, and as far as I know, they've not applied to renew it yet. Assuming it's not renewed and they no longer hold it, I do think there would be a mootness issue there. And at that point, it would also, the universe of the months that they say they couldn't comply will have been defined, and then the administrative appeal can resolve that. Okay. Let me ask you another thing. You lost in district court on 10%. Yes. Why do you think you should have come out the other way? I guess all of this is being framed as to whether there's an inconsistency with the terms of the lease. So could you speak to how the terms of the lease allow for this 10% cap? Sure. The terms of the lease are highest price paid or offered for the major production from the area at the time of production. And what the 10% does is it works with the rest of the rule to make adjustments to the differential in a way to bring that volume back into account over time. And it's true that it's not going to be responsive to wild swings. The community didn't expect that there would be wild swings. The differentials tend to be stable over time. Even this one where we've seen it, it's 95% correlated. And it provides that, again, it's a negotiated rule to implement those terms, and it provides certainty to industry, to the tribes that they would be able to comply. I do want to make one final point, which is that this idea that it's a one-way ratchet, there are circumstances. That's only because merit, in this case, it's only when they have the highest price. Because the way the major at the major portion price, 25% is gross proceeds. And then the next month it adjusts up and the price goes way up. All the producers who are not reporting at gross proceeds, the ones who don't have the highest, because there's going to be a range of prices in any given month, they're protected by that 10% cap. Even though those who are getting the highest price, they're paying their gross proceeds. That's true. But for industry-wide, it's providing protection for everyone who's not reporting in gross proceeds that they don't then have to pay up at that inflated price for that month. Just one last, the three-month argument that was made earlier, hasn't the agency regarded the time of production language to refer to a one-month period? I don't know. Well, I'm not sure that that's... I'm not sure if that's generally how they regard it or not. Here, they're using the most up-to-date data that they have to avoid the retroactive... The necessity to do it and get it otherwise would be you have to do the retroactive adjustments a year or two later. To do the most up-to-date that they have, they have to use that two months. Again, that only applies to the adjustment to the differential. It's not applying to the ultimate, to the price, the NYMEX price or the calculation. It's only to the adjustment to the differential that there's that lack. Imagine if we had an arm's-length negotiation here. What would that world look like? Would the royalty in an arm's-length negotiation under the lease language, would we still be in the land of this Rube Goldberg index? What would that look like? Well, I might resist the notion that it's not arm's-length when you have a rule-making committee that includes everyone from all sides developing this. There's certainly every interest was represented in coming up with the system and the index price. But isn't it based on the sweet oil in Cushing, Oklahoma? That's where it starts, but then you have to take into account the differential. That's why they have a separate differential for every single designated area and every single crew type, precisely because they recognize that there are differences between crew types, there are differences between locations. So you start with that, but then you use the real data for a year to develop what the difference is going to be so that you account for those differences. Thank you, counsel. I appreciate your excuse. The case is submitted.